66 Cal.Rptr.3d 110 (2007)
154 Cal.App.4th 970
BEGL CONSTRUCTION COMPANY, INC., et al., Plaintiffs, Cross-defendants, and Appellants,
v.
LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant, Cross-complainant and Appellant;
Star Insurance Company, Cross-defendant and Respondent.
No. B181933.
Court of Appeal of California, Second District, Division Four.
August 29, 2007.
Bergman & Dacey, Inc., Gregory M. Bergman, John P. Dacey, and John V. *111 Tamborelli, Los Angeles, for Defendant, Cross-complainant, and Appellant.
Mark E. Baker; Bistline & Cohoon and Ted H. Luymes, Torrance, for Plaintiffs, Cross-defendants, and Appellants.
Mark E. Baker, for Cross-defendant and Respondent.
Certified for Partial Publication.[*]
EPSTEIN, P.J.
This case arises from a public works construction contract entered into by appellant Los Angeles Unified School District (the District) and cross-appellant BEGL Construction Company, Inc. (BEGL).
The District argues the trial court abused its discretion in admitting evidence of BEGL's lost profits due to impaired bonding capacity. In the published portion of this opinion, we reject that argument. In the unpublished portion of this opinion, we consider the District's further contentions that: the court erred in admitting certain expert testimony regarding lost profits, evidence of extra work that was not the subject of written change orders, and testimony regarding damages that were the subject of stop notices; BEGL's claim for earned project costs is not supported by evidence, and is an attempt to recover money already encompassed in BEGL's request for delay damages; the court erred in denying its new trial motion on the False Claims Act cause of action; the court erred in denying its motion to vacate the judgment; the court improperly granted Star Insurance Company's (Star) motion for nonsuit; and it should have been awarded attorney fees under Public Contract Code section 7107. We also consider BEGL's arguments on cross-appeal that: the contractual liquidated damages provision limiting delay damages to $250 per day is unconscionable; the court erred in failing to award sanctions and prejudgment interest; and BEGL should have been awarded attorney fees, costs and penalty interest under Public Contract Code section 7107.
We shall affirm the judgment.

FACTUAL AND PROCEDURAL SUMMARY
In August 2000, the District awarded BEGL a public works construction contract for a seismic retrofit of the Science Building at its Los Angeles Center for Enriched Studies (LACES), and for the demolition and reconstruction of the LACES West Arcade. Because the project was a public work, BEGL was required to post a performance and payment bond. After BEGL started the project, the West Arcade work was removed from the scope of the contract.
The District terminated BEGL in January 2002. It then filed a bond claim with BEGL's surety, Fidelity & Deposit Company of Maryland (Fidelity), for completion of the LACES project. The District and Fidelity entered into a takeover agreement, and Fidelity hired another contractor to finish the project. Fidelity then sued BEGL. That case was later settled.
In April 2003, BEGL filed an action against the District for breach of contract and breach of warranty of plans and specifications. BEGL alleged the District breached the contract between them by: "a. Failing to issue a notice to proceed in a timely manner; [¶] b. Supplying inadequate and faulty plans and specifications; [¶] c. Failing to supply necessary design information in a reasonable and timely manner; [¶] d. Failing to provide sufficient qualified representatives to provide for timely resolution of design and other technical issues; [¶] e. Failing to cooperate with plaintiff to allow for the efficient and timely completion of the project; [f] f. Frustrating, obstructing, hindering and interfering *112 with plaintiffs performance of the project; [¶] g. Demanding that plaintiff perform work which was not an agreed part of plaintiffs scope of work; [¶] h. Failing to disclose pertinent information in defendants' possession and control, when such information was relevant and necessary for the proper and timely completion of the project; [¶] i. Failing to process requests for information and clarification in an efficient and timely manner; [¶] j. Failing to process change order requests in a timely manner[;][¶] k. Failing to grant plaintiff extra time to complete the project due to delays ...; [¶] 1. Failing to pay plaintiff sums due under the contract, extra work and changes; [¶] m. Failing to pay plaintiff sums due for delays, disruptions, and impacts in the work; [¶] n. Failing to pay plaintiff interest and penalties under Public Contract Code section § 7107, and like statutes, for the LAUSD's failure to make payments promptly; and [¶] o. Unlawfully terminating the contract."
In an amended cross-complaint, the District claimed that BEGL had breached the contract: "Within the last four (4) years, [BEGL] breached the Contract with the District by, without limitation, failing to perform work on the Project pursuant to the terms and conditions of the Contract, failing to timely complete its work on the Project, failing to correct defective and/or nonconforming work, failing to perform work per plans and specifications, failing to provide adequate labor and/or supervision, failing to complete the project on time, and failing to develop and maintain an appropriate schedule." The District also alleged that BEGL and its president, Mehr Z. Beglari, violated the False Claims Act. (Gov.Code, §§ 12650-12656.) Finally, the District sought damages from Star, the surety that issued a contractor's license bond to BEGL, for BEGL's alleged violation of the Business and Professions Code.
At the close of evidence, the trial court granted nonsuit on the District's claim against Star. A jury found that both BEGL and the District had breached the contract, and awarded BEGL $954,197 in damages and the District $1 in damages. The jury found that the District did not breach the warranty of plans and specifications. It also found that BEGL and Beglari did not violate the False Claims Act. After several post-trial motions by both parties, the District filed a timely notice of appeal. BEGL filed a timely cross-appeal.

DISCUSSION

I
At trial, BEGL argued that as a result of the District's breach of contract, its bonding capacity was diminished, causing BEGL to lose $506,000 in profits. After beginning the LACES project, which was bonded by Fidelity, BEGL began doing business with a new surety, CNA. BEGL then moved from CNA to INSCO/DICO. In 2002, BEGL's bonding capacity was $3 million to $4 million per job, and $6 million to $7 million aggregate for all work in progress. INSCO/DICO decided to stop bonding BEGL in November 2002 after it learned of the dispute between Fidelity and BEGL regarding the LACES project. BEGL's bonding agent tried to place BEGL with another surety, but he was unsuccessful. Sureties would not bond BEGL because of the current dispute between Fidelity and BEGL. Eventually, BEGL was bonded for $500,000 per job, and $500,000 aggregate.
Consistent with its position before and during trial, the District argues the trial court abused its discretion in admitting evidence of BEGL's lost profits. The District's primary contention is that because it was not foreseeable at the time of contracting *113 that BEGL would lose profits as a result of the District's breach, the damages are improper as a matter of law, and thus the evidence should not have been admitted.
The basic law on secondary or derivative damages from breach of contract was established over 150 years ago in the celebrated English precedent, Hadley v. Baxendale (1854) 156 Eng.Rep. 145. That decision has been followed and applied in California through Civil Code section 3300 and a series of cases, beginning with Hunt Bros. Co. v. San Lorenzo etc. Co. (1906) 150 Cal. 51, 56, 87 P. 1093.
Our Supreme Court's most recent and definitive application of this law in the context of a construction contract is in Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist. (2004) 34 Cal.4th 960, 973, 975, 22 Cal. Rptr.3d 340, 102 P.3d 257 (Lewis Jorge).[1] In that case, the court held that loss of potential profits on unearned future construction projects due to impaired bonding capacity was not recoverable as general damages because "[t]he District's termination of the school contract did not directly or necessarily cause Lewis Jorge's loss of potential profits on future contracts. Such loss resulted from the decision of CNA, Lewis Jorge's surety at the time of the breach, to cease bonding Lewis Jorge." (Id. at p. 973, 22 Cal.Rptr.3d 340, 102 P.3d 257.) But the court did not foreclose the availability of lost profits as secondary or special damages. "Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)." (Id. at pp. 968-969, 22 Cal.Rptr.3d 340, 102 P.3d 257.)
Under the facts in Lewis Jorge, the court held that loss of potential profits on future unearned construction projects was not recoverable as special damages because the "[e]vidence at trial established that the owner's terminating a contract might or might not cause the contractor's surety to reduce its bonding capacity. As the District pointed out at oral argument, when it signed the contract it did not know what Lewis Jorge's balance sheet showed or what criteria Lewis Jorge's surety ordinarily used to evaluate a contractor's bonding limits. Absent such knowledge, the profits Lewis Jorge claimed it would have made on future, unawarded contracts were not actually foreseen nor reasonably foreseeable." (Lewis Jorge, supra, 34 Cal.4th at p. 977, 22 Cal.Rptr.3d 340, 102 P.3d 257.)
Unlike the showing in Lewis Jorge, in this case there is sufficient evidence of foreseeability. BEGL's bonding agent, Matthew Welty, stated that "[w]henever there's a dispute between a surety company, whether there's a lawsuit between where a contractor is suing a bonding company or vice versa, no other surety company wants to do business with that contractor until that is resolved."
District witness Jordan S. Rosenfeld, a certified public accountant and member of the National Bond Claims Association, stated that "when the surety has a dispute with the contractor, they typically don't get bonded." In explaining several factors *114 contributing to BEGL's inability to obtain bonding, Rosenfeld went on to say that "F & D had to step in as the surety for [BEGL] on this project and finish the job. They had incurred costs and [were] now looking to [BEGL] and the personal indemnitors to repay them. Once a company has an outstanding issue like that, sureties no longer will provide bonds until satisfaction is accomplished."
Another District witness, Gregg Okura, the vice-president of underwriting at INSCO/DICO, testified that it was "the general policy" in "the bonding industry that as soon as a bond company learns of a dispute between a contractor and a bond company, they don't write further bonds for that contractor."
During a meeting regarding the LACES project, the District's construction manager "stated that if BEGL decides to abandon the job, [the District] would contact their bonding company to inform them of the situation. [He] stated that the District is not in the business of breaking contractors but if BEGL decides not [to] comply with the plans and specifications, the District has the right under FORM 82.39, to finish the job by whatever means necessary." (Italics added.)
Although the District may not have known what BEGL's balance sheet showed, or what criteria BEGL's surety used to determine bonding capacity, the evidence established an industry custom that where there is a dispute between a surety and a contractor, the contractor will not be bonded so long as the dispute remains unresolved. Unlike the equivocal showing in Lewis Jorge, where the "owner's terminating a contract might or might not cause the contractor's surety to reduce its bonding capacity," in this case, the evidence of industry custom was unequivocal. (Cf. Lewis Jorge, supra, 34 Cal.4th at p. 977, 22 Cal.Rptr.3d 340, 102 P.3d 257, italics added.) The statement of the District's construction manager about "breaking" contractors demonstrates that the District was aware of the industry custom, and knew that terminating BEGL and filing a claim with Fidelity could do just that.
Because the evidence was sufficient for a trier of fact to reasonably find that BEGL's lost profits due to impaired bonding capacity resulting from the District's breach, were foreseeable to the District at the time of contracting, the court did not abuse its discretion in admitting evidence of lost profits. The jury was properly instructed that in order to award such damages, it had to first find forseeability: "[BEGL] also claims damages for loss of future profits and damage to its bonding capacity. To recover for harm, BEGL must prove that when the parties made the contract [the District] knew or reasonably should have known of the special circumstances leading to such harm." (Italics omitted.)
The District argues that because there was no evidence in the record "as to any project that BEGL would likely have won as the low bidder or any sum flowing from any project," the lost profits damages are speculative and uncertain. "Lost anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all from the proposed undertaking. But lost prospective net profits may be recovered if the evidence shows, with reasonable certainty, both their occurrence and extent. [Citation.]" (S.C. Anderson, Inc. v. Bank of America (1994) 24 Cal.App.4th 529, 536, 30 Cal.Rptr.2d 286 (S.C.Anderson).) "`Mathematical precision'" is not required. (Lewis Jorge, supra, 34 Cal.4th at p. 975, 22 Cal.Rptr.3d 340, 102 P.3d 257.) Although lost profits damages due to diminished bonding capacity are not inherently speculative, "such damages are frequently denied as too *115 speculative." (Lewis Jorge, supra, 34 Cal.4th at p. 975, 22 Cal.Rptr.3d 340, 102 P.3d 257; see also Arntz Contracting Co. v. St. Paul Fire Marine Ins. Co. (1996) 47 Cal.App.4th 464, 489, 54 Cal.Rptr.2d 888 (Arntz) ["lost profit from impaired bonding capacity ... is not inherently speculative"].) "These cases bar recovery of profits lost on future contracts not because the amount of the lost profits is speculative or remote, but because their occurrence is uncertain." (Lewis Jorge, supra, 34 Cal.4th at p. 976, 22 Cal.Rptr.3d 340, 102 P.3d 257.)
Although the Lewis Jorge court noted that the contractor's purported lost profits were uncertain and speculative, the court's basis for reversing the lost profits damage award was lack of forseeability. (Lewis Jorge, supra, 34 Cal.4th at p. 977, 22 Cal. Rptr.3d 340, 102 P.3d 257.) "No court has adopted [the] position that damages for lost bonding capacity can be established only with proof of `specific, identified construction projects that the contractor had prepared bids on, but was precluded from submitting because of an inability to obtain bid bonds.'" (Arntz, supra, 47 Cal. App.4th at p. 489, 54 Cal.Rptr.2d 888.)
While BEGL did not present evidence regarding specific projects or sums lost as a result of its impaired bonding capacity, it provided other evidence of lost profits. BEGL was started in 1987, and it began performing public works projects in 1995. Beglari testified that BEGL was bidding jobs until INSCO/DICO was notified about the dispute between Fidelity and BEGL in November 2002. Once that occurred, BEGL could no longer obtain bonding for public works projects.
BEGL's expert, Ashton Golbar, a certified public accountant, testified that from 1997 through 2001, BEGL had an average annual income of $433,000. BEGL bid on approximately 15 jobs while bonded by INSCO/DICO, and was awarded four or five of them. After reviewing all of BEGL's financial information from 1997 to the time of trial, Golbar testified that BEGL lost $506,000 in profits from November 2002 until the time of trial, November 2004, as a result of the loss of bonding capacity.
"Requiring [a contractor] to prepare detailed bids it could never submit would compel a senseless waste of time and provide no surer safeguard against speculative damages." (Arntz, supra, 47 Cal.App.4th at p. 489, 54 Cal.Rptr.2d 888.) Because the District has not provided any other reason why the lost profits damages in this case are speculative or uncertain, we affirm the award.

II-XII[**]

DISPOSITION
The judgment and orders are affirmed. Each party is to bear its own costs on appeal.
We concur: WILLHITE and MANELLA, JJ.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, V, VI, VII, VIII, IX, X, XI and XII of the Discussion.
[1] Lewis Jorge was decided about a month after the jury verdict in this case. BEGL argues that to the extent Lewis Jorge establishes new standards regarding lost profits due to diminished bonding capacity, it would be "fundamentally unfair" to apply the case retroactively. Because Lewis Jorge only applies existing law, we find no reason not to apply the case here.
[**] See footnote *, ante.